## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | |
|---|---|
| IN RE: | ) |
| | ) |
| AREDIA® AND ZOMETA® PRODUCTS | ) No. 3:06-MD-1760 |
| LIABILITY LITIGATION | ) |
| | ) JUDGE CAMPBELL |
| (MDL No. 1760) | ) |
| | ) MAGISTRATE JUDGE BROWN |
| This Document Relates To Case No.: | ) |
| 3:08-cv-00918 (Zimmerman/Newman) | ) |
| | ) |

## NOVARTIS PHARMACEUTICALS CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF *DAUBERT* MOTION TO EXCLUDE CAUSATION TESTIMONY OF PLAINTIFF'S EXPERTS IN THE *NEWMAN* CASE

Plaintiff Stacy Zimmerman, the daughter of Phyllis Newman, has designated Dr. Frederick Smith, Dr. John Irey, Dr. Marc Fisher, Dr. John Mennitt, and Dr. George Obeid, Ms. Newman's treating healthcare providers, as non-retained experts. Plaintiff also has retained Dr. Richard Kraut as an expert. To the extent that any of these experts has been designated to present testimony that Aredia® and Zometa® caused Ms. Newman to develop osteonecrosis of the jaw ("ONJ"), his testimony should be excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702.[1] Three of the five designated treaters expressly disavowed expertise in determining the cause of ONJ and therefore are unqualified to opine on causation. Moreover, to the extent any treater offers an opinion regarding the cause of Ms. Newman's jaw problems, none of them employed a reliable

---

[1] NPC reserves the right to raise other objections to the admissibility of any testimony by these potential witnesses. In addition, NPC incorporates by reference the legal authorities and arguments on the general causation and qualifications issues thoroughly addressed in NPC's Memorandum in Support of *Daubert* Motion to Exclude Testimony of Plaintiff's Expert Dr. Richard Kraut filed in *Hill v. Novartis Pharmaceuticals Corp.*, 3:08-cv-00934 (M.D. Tenn. Oct. 16, 2010), ECF No. 44.

methodology in reaching such a conclusion.  Dr. Kraut's specific causation opinion is unreliable because his differential diagnosis is fraught with critical omissions regarding risk factors that are revealed in Ms. Newman's medical and dental history.  Additionally, Dr. Kraut's purported "methodology" for ruling out other potential risk factors as the cause of Ms. Newman's jaw problems consists entirely of his own unsubstantiated assumption that bisphosphonates caused Ms. Newman's condition.  As such, any causation testimony offered by these witnesses is inadmissible and should be excluded.

## FACTUAL BACKGROUND

I.      **PHYLLIS NEWMAN'S MEDICAL AND DENTAL HISTORY**

Phyllis Newman was first diagnosed with breast cancer in 1987.  Transcript of the Deposition of Dr. Frederick Smith (hereinafter, "Smith Dep.") at 21 (Ex. 1).  In 1997, Ms. Newman was diagnosed with metastatic breast cancer to bone and in January 1998, Ms. Newman's doctors prescribed Aredia® for her to prevent skeletal related events.  Smith Dep. at 24-26.

On June 26, 2001, Ms. Newman presented to Dr. John Mennitt, an oral and maxillofacial surgeon, with an impacted tooth #16.  Transcript of the Deposition of Dr. John Mennitt (hereinafter, "Mennitt Dep.") at 23 (Ex. 2).  Dr. Mennitt extracted Ms. Newman's tooth #16 on July 25, 2001.  Mennitt Dep. at 35.  On August 21, 2001, Dr. Mennitt observed a small visible sequestrum, or a small piece of exposed bone, in Ms. Newman's jaw.  *Id.* at 38.  In September 2001, Dr. Mennitt removed a large sequestrum from the area where tooth #16 had been extracted and diagnosed Ms. Newman with osteomyelitis, because, as he testified, "in my world at that time there was plain osteomyelitis and there was radiation osteomyelitis.  And those were the only two entities, and I had known she had not had any radiation to the jaw."  *Id.* at 39-40.

2

In April of 2002, Dr. Smith switched Ms. Newman's prescription from Aredia® to Zometa®.  Smith Dep. at 28-29.  In September 2003, Dr. Mennitt recommended surgery on Ms. Newman's jaw.  Mennitt Dep. at 24-25, 56.  Ms. Newman wanted a second opinion, so Dr. Mennitt referred her to Dr. George Obeid, another oral and maxillofacial surgeon at Washington Hospital Center.  *Id.*  On September 23, 2003, Ms. Newman visited Dr. Obeid for the first time.  Transcript of the Deposition of Dr. George Obeid (hereinafter, "Obeid Dep.") at 24 (Ex. 3).  Dr. Obeid told Dr. Mennitt about the possibility that Ms. Newman's jaw problems were related to her bisphosphonate use in October 2003.  Mennitt Dep. at 59.  Around the same time, Dr. Smith discontinued Ms. Newman's Zometa® infusions at her request after Ms. Newman told him that her jaw problems could be related to Zometa®.  Smith Dep. at 31-32.

In November of 2003, Dr. Obeid performed surgery on Ms. Newman's jaw, extracted Ms. Newman's tooth #12, and sent tissue samples to pathology.  Obeid Dep. at 54-57.  The pathology reports from the November 2003 surgery diagnosed Ms. Newman with "[a]cute osteomyelitis with numerous colonies of actinomyces."  *Id.* at 57-59.  Dr. Obeid referred Ms. Newman to Dr. Trinh, an infectious disease specialist, who diagnosed Ms. Newman with "cervicofacial actinomyces due to a chronic dental infection."  *Id.* at 61-63.  Dr. Obeid acknowledged that other pathology reports taken of Ms. Newman's jaw throughout his care of her were consistent with a diagnosis of osteomyelitis.  *See id.* at 75-76, 82-83.  Dr. Obeid treated Ms. Newman's jaw problems until December of 2006.  *Id.* at 29.  In March of 2007, she passed away as a result of her metastatic breast cancer.  Certificate of Death (Ex. 4).

## II.        THE DESIGNATED HEALTH CARE PROVIDERS

Plaintiff's suit against Novartis Pharmaceuticals Corporation ("NPC") claims that Ms. Newman's use of Aredia® and Zometa® caused her to develop ONJ.  In support of her claims, plaintiff designated Drs. Smith, Irey, Fisher, Mennitt, and Obeid as non-retained expert

witnesses. *See* Plaintiff's Rule 26(a)(2)(A) Statement ("Pl.'s Stmt.") (Ex. 5). Plaintiff stated that she expects to elicit opinions from each physician regarding Ms. Newman's treatment and whether Ms. Newman "had Bisphosphonate Osteonecrosis." *Id.* at 1. However, three of these witnesses testified that they lack the necessary expertise to render any opinion on ONJ causation, the fourth testified that he did not diagnose Ms. Newman's jaw problems as being related to Aredia® and Zometa® at the time he treated Ms. Newman, and the fifth testified that he could not opine to a reasonable degree of medical certainty that Aredia® and Zometa® caused Ms. Newman's jaw problems.

### A.     Dr. Frederick Smith

Dr. Smith, an oncologist, treated Ms. Newman for her breast cancer starting in 1991. Smith Dep. at 8. He testified that he is not an expert in bisphosphonates, ONJ or its risk factors. *Id.* at 19. Dr. Smith also admitted that he did not perform a differential diagnosis to determine the cause of Ms. Newman's jaw problems. *Id.* at 33; *see also id.* (agreeing that he would have deferred to Ms. Newman's dental treaters regarding the problems she experienced in her mouth). In fact, Dr. Smith testified that he never formed an opinion to a reasonable degree of medical certainty as to the cause or diagnosis of Ms. Newman's jaw problems. *Id.* at 39.

### B.     Dr. John Irey

Dr. Irey is a dentist who began treating Ms. Newman in June 2006 after Dr. Danoff, her previous dentist, passed away. Transcript of the Deposition of Dr. John Irey (hereinafter, "Irey Dep.") at 14, 36 (Ex. 6). He likewise disclaimed any expertise regarding ONJ or bisphosphonates. *Id.* at 32.

Dr. Irey testified that he did not perform a differential diagnosis to determine the cause of Ms. Newman's jaw problems. *Id.* at 56-57. Rather, his medical records simply reflect the diagnosis reported in the records of Ms. Newman's other treating physicians. *Id.*

### C.     Dr. Marc Fisher

Dr. Fisher is a periodontist who began treating Ms. Newman in 1994 and continued to treat her as of the time of his December 2006 deposition. *See* Transcript of the Deposition of Dr. Marc Fisher (hereinafter, "Fisher Dep.") at 32, 153 (Ex. 7).  Dr. Fisher testified that he is not an expert in the causes of ONJ and also testified that he did not personally diagnose Ms. Newman with ONJ.  *Id.* at 38, 156 (agreeing that Ms. Newman's ONJ diagnosis "came from other physicians.").   Dr. Fisher also admitted that he has not done any research into whether there are other causes of ONJ, and therefore cannot rule out potential causes such as chemotherapy.  *Id.* at 50.

### D.     Dr. John Mennitt

Dr. Mennitt, Ms. Newman's first oral and maxillofacial surgeon, testified that he has not been retained by plaintiff to testify as an expert in this litigation.  Mennitt Dep. at 13-14.  Dr. Mennitt testified that he diagnosed Ms. Newman with osteomyelitis, not ONJ.  *Id.* at 39-40.  In fact, Dr. Mennitt never diagnosed Ms. Newman's jaw problems as being associated with bisphosphonates because he had never heard of the alleged association until Dr. Obeid told him about it in October of 2003, which was after he stopped treating her:

> Q.      Now, when Dr. Obeid told you that he thought Ms. Newman's jaw
> problems were related to her "Zymoda" or Zometa use was this the first
> time that you  had ever heard of such an association?
>
> A.      Absolutely.
>
> Q.      And so you were not aware of any literature describing this as an
> association, correct?
>
> A.      I was not.  He was.
>
> Q.      So you never diagnosed Miss Newman's jaw problems as related to
> Zometa or Aredia?

> A.      I did not because I was unaware of any issues with the meds she had been taking.
>
> Q.      So your diagnosis before speaking to Dr. Obeid was osteomyelitis, correct?
>
> A.      Yes.  Osteomyelitis is a blanket term, and it just simply means infected bone.  I wasn't aware of a different species of osteomyelitis.

*Id.* at 59-60 (objections omitted); 24-25 (Dr. Mennitt stopped treating Ms. Newman in October of 2003); *see also id.* at 40 (explaining that "in my world," in 2001 when he was treating Ms. Newman, osteomyelitis was the only diagnosis available to him).

**E.      Dr. George Obeid**

Dr. Obeid,[2] an oral and maxillofacial surgeon, testified that he could *not* provide an opinion as to whether bisphosphonates specifically caused Ms. Newman's ONJ.  *See* Obeid Dep. at 142-43 ("I cannot tell you [bisphosphonates] caused the [jaw problem]. … I don't have any evidence to say that really personally.").  He testified that he had only a "strong suspicion," that bisphosphonates may have caused Ms. Newman's jaw problems, not an opinion to the required reasonable degree of medical certainty:

> Q.       … Had you formed a conclusion to a reasonable degree of medical certainty at this time that her maxilla problems had been caused by Aredia or Zometa?
>
> A.      Just suspicion, strong suspicion**.**

*Id.* at 92.  In fact, Dr. Obeid conceded that his "suspicion" was based on case reports and a single letter to the editor, which he acknowledged were insufficient evidence to establish scientific causation to a reasonable degree of medical certainty.  *Id.* at 53, 131; *see also id.* at 113, 122-23

---

[2] Dr. Obeid was also a treating oral and maxillofacial surgeon in the *Simmons* case.  *See* Order at 5-6, *Simmons v. Novartis Pharms. Corp.*, 3:06-md-01760 (M.D. Tenn. Dec. 7, 2010), ECF No. 4056 ("*Simmons* Order") (granting NPC's motion to exclude the causation testimony of Dr. Obeid).

6

(agreeing that his own published case reports about Ms. Newman could not establish scientific causation to a reasonable degree of medical certainty).

Dr. Obeid likewise conceded that he failed to rule out other causes of Ms. Newman's jaw problem unrelated to bisphosphonates. For example, he agreed that it was "possible" that Ms. Newman could have had an infection with actinomyces at the time of the 2001 extraction of tooth #16. *Id*. at 64. Dr. Obeid testified that he could not rule out a possible chronic infection with actinomyces, *id*. at 110, or other possible causes of Ms. Newman's jaw problems, such as Ms. Newman's long-term sinus infection, *id*. at 108 ("Can't rule it out."), which he acknowledged can "[s]ometimes" result in a sequestration of bone, *id*. at 36. Dr. Obeid also acknowledged that "it's possible" for a patient to be treated with bisphosphonates, such as Ms. Newman, and have osteomyelitis not caused by bisphosphonates. *Id*. at 121. He further acknowledged that Ms. Newman's pathology reports consistently indicated that she had osteomyelitis. *Id*. at 54-59, 61-63, 75-76, 82-83.

## III.   DR. KRAUT'S OPINIONS.

Dr. Kraut submitted a five-page report citing the case series published by Dr. Robert Marx[3] Dr. Salvatore Ruggiero[4] and the American Association of Oral and Maxillofacial Surgeons ("AAOMS") position papers[5] to support his opinions.[6] Report of Dr. Richard Kraut in

---

[3] Robert Marx, *Pamidronate (Aredia) and Zoledronate (Zometa) Induced Avascular Necrosis of the Jaws, a Growing Epidemic*, 61 J. Oral Maxillofacial Surg. 1115 (2003) (Ex. 8).

[4] Salvatore Ruggiero, *et al*., *Osteonecrosis of the Jaws Associated with the Use of Bisphosphonates: A Review of 63 Cases*, 62 J. Oral Maxillofacial Surg. 527 (2004) (Ex. 9).

[5] American Association of Oral and Maxillofacial Surgeons, *Position Paper on Bisphosphonate-Related Osteonecrosis of the Jaws*, 2006 (Ex. 10); American Association of Oral and Maxillofacial Surgeons, *Position Paper on Bisphosphonate-Related Osteonecrosis of the Jaws*, 2009 Update ("2009 AAOMS position paper") (Ex. 11).

[6] Dr. Kraut's only other reference to materials he considered was his testimony that he "followed numerous articles within the professional literature," including those cited in the two articles he has written on the topic. Report at 2.

7

the *Newman* Case at 2 (Ex. 12) (hereinafter "Report").  One section of Dr. Kraut's report focuses

on Ms. Newman, and Dr. Kraut's case-specific opinions therein have little scientific support.

For example, Dr. Kraut's report mentions that several specimens were taken from Ms.

Newman's jaw and submitted for pathological testing, *id.* at 4, but he neglects to mention that

these pathology reports and the opinions of Ms. Newman's oral surgeons all concluded that Ms.

Newman had osteomyelitis.[7]  This omission is in conflict with Dr. Kraut's testimony in earlier

cases in this MDL in which he testified that osteomyelitis can cause ONJ absent bisphosphonate

exposure,[8] and that he has treated 15-20 patients who experienced necrotic bone due to

osteomyelitis.[9]  Dr. Kraut has conceded that the only way he could rule out osteomyelitis as a

cause of ONJ in someone who had taken bisphosphonates would be if that person had no history

of any signs or symptoms of osteomyelitis.  April 5 Kraut Dep. at 134-35.  Ms. Newman clearly

does not meet those criteria.

At his deposition in this case, Dr. Kraut testified that he considered actinomyces

osteomyelitis as a possible cause of Ms. Newman's jaw condition.  May 4 *Newman* Kraut Dep.

at 61-62.  He acknowledged that several pathology reports diagnosed Ms. Newman with

osteomyelitis with actinomyces, a type of bacteria.  *Id.* at 47, 48, 50.  Dr. Kraut also

acknowledged that it would be impossible to tell which came first – the actinomyces or the

necrotic bone.  *Id.* at 64-65 ("When you end up with dead bone you're going to end up with

---

[7] *See* Transcript of the Deposition of Dr. Richard Kraut in *Newman v. Novartis Pharms. Corp.,* 3:08-cv-00918 (M.D. Tenn. May 4, 2011) (Ex. 13) (hereinafter "May 4 *Newman* Kraut Dep.") at 44 (May 2002 pathology report), 47 (November 2003 pathology report diagnosing "acute osteomyelitis with numerous colonies of actinomyces"), 48 (March 2004 pathology report diagnosing "acute osteomyelitis and necrosis, and . . . actinomyces."), 50 (November 2005 pathology report diagnosing "actinomycosis focal acute osteomyelitis"); Obeid Dep. at 57-59, 61-63, 75-76, 82-83; *see also* Mennitt Dep. at 39-40 (diagnosing Ms. Newman with osteomyelitis).

[8] Transcript of the Deposition of Dr. Richard Kraut at 55, 163 (Apr. 6, 2010) (Ex. 14) (hereinafter, "April 6 Kraut Dep.")

[9] Transcript of the Deposition of Dr. Richard Kraut at 47 (Apr. 5, 2010) (Ex. 15) (hereinafter "April 5 Kraut Dep.").

actinomycosis, and the real question is which came first, the chicken or the egg, and with dead

bone in the mouth you're typically going to have actinomycosis.")  In other words, Dr. Kraut

acknowledged that it would be impossible to rule out actinomyces as the sole cause of Ms.

Newman's necrotic bone.

Nevertheless and without any scientific support, Dr. Kraut continued to opine as he did in

his report, that "it is clear from our current knowledge that [bisphosphonate related

osteonecrosis] is the disease process that she suffered from."  Report at 5.  That is because, as Dr.

Kraut has repeatedly testified, he diagnoses any cancer patient with a history of bisphosphonate

use with bisphosphonate-related ONJ, *even if that patient had been diagnosed with osteomyelitis*.

*See* Transcript of the Deposition of Dr. Richard Kraut in *Nightlinger v. Novartis Pharms. Corp.*,

3:06-cv-00693 (Sept. 24, 2010) 35 ("Sept. 24 *Nightlinger* Kraut Dep.") (Ex. 16); *see also* April 6

Kraut Dep. at 164; Transcript of the Deposition of Dr. Richard Kraut at 139 (Apr. 27, 2010)

(hereinafter "April 27 Kraut Dep.") (Ex. 17).  Dr. Kraut testified that in Ms. Newman's case, if

she had suffered the same course and had not been taking bisphosphonates, he would not be able

to diagnose the cause of her jaw problems:

> Q.    So you would just leave [the diagnosis] with a blank if she wasn't
>        on bisphosphonates?
>
> A.    Sometimes that's as good as we can get.

May 4 Newman Kraut Dep. at 60.

Additionally, Dr. Kraut did not include in his differential diagnosis other potential

etiologies for Ms. Newman's jaw problems.  May 4 *Newman* Kraut Dep. at 67 (admitting that he

only considered BRONJ, osteomyelitis, and osteoradionecrosis in his differential diagnosis).  For

example, Dr. Kraut left Ms. Newman's periodontal disease off of his differential diagnosis:

> Q.    Your report doesn't mention periodontal disease, does it?

> A.    I don't think she ended up with an oral antral communication due
>        to periodontal disease.

May 4 *Newman* Kraut Dep. at 74-75 (acknowledging that Ms. Newman had periodontal disease in the exact location where she eventually developed necrotic bone). However, Dr. Kraut has acknowledged that periodontal disease can cause necrotic bone.[10] He also has opined that long-standing periodontal disease "can lead to osteomyelitis" and "can be a portal for entry for infection into bone," April 6 Kraut Dep. at 63. In fact, plaintiff's expert, Dr. Marx, has identified periodontal disease as the number one co-morbidity for ONJ, Sept. 24 *Davids* Kraut Dep. at 65 (citing Transcript of the Deposition of Dr. Robert Marx 1075 (March 10, 2010)), a proposition with which Dr. Kraut did not disagree:

> Q.    . . . Do you agree with Dr. Marx that periodontal disease is the
>        number one comorbidity for BRONJ.
>
> A.    I hadn't thought about it but probably yes. Because that means
>        occurring in patients with, the answer would be yes.

*Id.* at 66. Dr. Kraut also agreed with the 2009 AAOMS position paper that "a patient like [Ms. Newman] who has received IV bisphosphonates and has a history of . . . periodontal disease . . . is at a sevenfold increased risk" of developing ONJ. Sept. 24 *Nightlinger* Kraut Dep. at 73-74.

Dr. Kraut acknowledged that ONJ can be idiopathic. May 4 *Newman* Kraut Dep. at 61. He summarily dismissed other possible contributing factors to Ms. Newman's ONJ, such as her cancer, chemotherapy, and corticosteroid use by saying that "life is a contributing factor." *Id.* at 59. Dr. Kraut also acknowledged that in the absence of a test confirming that bisphosphonates caused Ms. Newman's ONJ, the jury is only left with his "say so" that bisphosphonates caused Ms. Newman's ONJ:

---

[10] Transcript of the Deposition of Dr. Richard Kraut in *Davids v. Novartis Pharms. Corp.*, 3:08-cv-00070 (Sept. 24, 2010) 65 ("Sept. 24 *Davids* Kraut Dep.") (Ex. 18).

Q.      There's no test that you can run that would objectively determine
        whether bisphosphonates were a contributing cause to Ms.
        Newman's jaw condition, correct?

A.      Not that I am aware of.

Q.      So ultimately we're left with your say so as to what caused her
        problem?

A.      Yeah.

*Id*. at 61.

## ADMISSIBILITY STANDARDS UNDER *DAUBERT* AND RULE 702

In *Daubert*, the Supreme Court addressed the admissibility of expert testimony and
established "the exacting standards of reliability such evidence must meet."  *Weisgram v. Marley
Co.*, 528 U.S. 440, 455 (2000).  Plaintiff has the burden of proving that her proposed expert
testimony is admissible under *Daubert* and its progeny.  *See*, *e.g.*, *Sigler v. Am. Honda Motor
Co.*, 532 F.3d 469, 478 (6th Cir. 2008).

First, plaintiff must establish that the witness has the necessary expertise, in the form of
"knowledge, skill, experience, training, or education," Fed. R. Evid. 702, to render an opinion on
the specific issue addressed by his proposed testimony, *see Sigler*, 532 F.3d at 479.  Second,
plaintiff must establish that the expert's testimony is "reliable" – i.e., that the testimony is
"ground[ed] in the methods and procedures of science," as opposed to the expert's "subjective
belief or unsupported speculation."  *Daubert*, 509 U.S. at 589-90 (quotation marks omitted);
*Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010) ("a plausible hypothesis . . . may
even be right.  But it is no more than a hypothesis, and it thus is not 'knowledge,' nor is it 'based
upon sufficient facts or data' or the "product of reliable principles and methods . . . applied . . .
reliably to the facts of the case." (quoting Fed. R. Evid. 702)), *cert. denied*, 79 U.S.L.W. 3554
(2011). Third, plaintiff must establish that the testimony "will assist the trier of fact in

11

understanding and disposing of issues relevant to the case," *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000); *see* Rule 702, which means that the testimony must have "a valid scientific connection" to – i.e., must "fit" – the pertinent inquiry in the lawsuit, *Daubert*, 509 U.S. at 591-92; *Pride*, 218 F.3d at 578.

Like testimony by other expert witnesses, opinion testimony by a treating physician also must satisfy the *Daubert* admissibility standards.  *See Tamraz*, 620 F.3d at 673 ("None of this means that [treating] physicians may not testify to etiology . . . only that courts must apply the *Daubert* principles carefully in considering it."); *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 426 (6th Cir. 2009); *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1105 n.14 (7th Cir. 1994); *see also Bland v. Verizon Wireless, (VAW) L.L.C.*, 538 F.3d 893, 897 (8th Cir. 2008) ("A treating physician's expert opinion on causation is subject to the same standards of scientific reliability that govern the expert opinions of physicians hired solely for purposes of litigation." (quotation marks omitted)).

## ARGUMENT

### I.    DRS. SMITH, IREY, AND FISHER TESTIFIED THAT THEY ARE NOT QUALIFIED TO OPINE ON THE CAUSE OF MS. NEWMAN'S ONJ.

Drs. Smith, Irey, and Fisher are not qualified to testify on specific causation because they lack "knowledge, skill, experience, training or education" regarding these subjects.  Fed. R. Evid. 702.  Dr. Smith is an oncologist and admitted that he is not an expert on ONJ or its risk factors. Smith Dep. at 19.  He testified that he lacked the necessary expertise to offer opinions regarding ONJ or any potential association with bisphosphonates.  *Id.*

Dr. Irey, a dentist, and Dr. Fisher, a periodontist, likewise disclaimed expertise regarding ONJ and its causes in Ms. Newman's case.  Irey Dep. at 32; Fisher Dep. at 38-39.  They do not consider themselves experts on ONJ or the potential risk factors for ONJ.  Irey Dep. at 32; Fisher

12

Dep. at 38-39.  Finally, just because Dr. Fisher has opinions about the causes of ONJ does not mean these opinions are admissible.  *See* Order at 3-4, *Kyle v. Novartis Pharms. Corp.*, 3:06-md-01760 (M.D. Tenn. Dec. 7, 2010), ECF No. 4063 ("*Kyle* Order") (excluding the causation testimony of a treating physician who had opinions about causation but also disclaimed expertise in ONJ and its causes).

      This Court has excluded the causation testimony of treating physicians in several cases based, in part, on the physicians' lack of expertise regarding ONJ or its causes.  *See, e.g.*, *Simmons* Order, *Kyle* Order.  Other courts have frequently excluded causation opinions from witnesses who admit they are not experts in an area in which a party purports to designate them. *See, e.g., Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 611 (7th Cir. 2002) (upholding district court's exclusion of expert testimony when purported expert admitted at deposition that he was not expert in the subject he relied on to form his conclusion); *Francois v. Colonial Freight Sys., Inc.*, Civil Action No. 3:06-cv-434-WHB-LRA, 2008 WL 80399, at *2-3 (S.D. Miss. Jan. 4, 2008) (limiting expert's opinions to clinical psychology and not neuropsychology when expert testified he was not expert in field of neuropsychology) (Ex. 19); *In re Baycol Prods. Litig.*, 532 F. Supp. 2d 1029, 1047 (D. Minn. 2007) ("If an expert is not qualified to opine in a particular area, and [the proffered expert] admits he is not qualified to provide opinions about a drug's comparative safety, such testimony is excluded under *Daubert*.").[11]  The concessions of Drs. Smith, Irey, and Fisher about their lack of expertise regarding ONJ and its causes indicate that they are not qualified to opine on this subject.  Their

---

[11] *Long v. Monaco Coach Corp.*, No. 3:04-CV-203, 2007 WL 4613000, at *5-6 (E.D. Tenn. Sept. 27, 2007) (excluding expert offered to value motor coaches who "testified repeatedly that he was not an expert in the field of valuation") (Ex. 20); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004) ("In view of [proffered expert's] admitted lack of pertinent expertise, the testimony is excluded.").

additional testimony simply buttresses these individuals' assessments of their lack of qualifications to opine on this issue.

## II.    TO THE EXTENT THAT DRS. SMITH, IREY, AND FISHER EVEN OFFER A CAUSATION OPINION, IT IS NOT GROUNDED IN A RELIABLE METHODOLOGY.

In light of their admitted lack of expertise on the subject, Drs. Smith, Irey, and Fisher conceded that their opinions regarding the cause of Ms. Newman's jaw problems were based upon the view of others. Smith Dep. at 40 (testifying that he relied on another treater's diagnosis); Irey Dep. at 56-57 (same); Fisher Dep. at 156 (same).

To the extent that Dr. Smith's, Dr. Irey's, and Dr. Fisher's opinions regarding the possible cause of Ms. Newman's jaw problems merely repeat a diagnosis made by another healthcare provider, such methodology is not proper and their testimony regarding any causation opinions is not admissible. *See, e.g., Dura Auto. Systems*, 285 F.3d at 613 (experts unqualified in a particular field cannot simply parrot opinions of another, qualified expert); *Cooley v. Lincoln Elec. Co.*, 693 F. Supp. 2d 767, 781 (N.D. Ohio 2010) ("Providing medical care to a patient in reliance on other specialists' diagnoses is proper, but offering [medical] testimony to a jury solely to endorse the opinions of those specialists is not.").

Moreover, Dr. Smith, Dr. Irey and Dr. Fisher all admitted that they had not performed a differential diagnosis as to the cause of Ms. Newman's jaw problems. Smith Dep. at 33; Irey Dep. at 56-57; Fisher Dep. at 156. The failure to perform a differential diagnosis provides yet an additional basis to preclude these individuals from opining on causation. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 761 n.31 (3rd Cir. 1994) (failure to rule out alternative causes is fatal to the reliability prong because "it means that these alternative causes may have been the sole causes of plaintiffs' injuries"); *see also infra* Part IV.

Because these witnesses have no independent opinion regarding causation and did not undertake the diagnostic steps necessary to do so, they should not be permitted to offer any causation opinion at trial.

## III.   PLAINTIFF HAS NOT ESTABLISHED THAT DR. MENNITT OR DR. OBEID ARE QUALIFIED TO OPINE ON CAUSATION.

Plaintiff cannot establish that Dr. Mennitt or Dr. Obeid possesses the requisite qualifications to opine as to the cause of Ms. Newman's jaw problems.  Without establishing that they are qualified to opine on this subject, they cannot testify about it.  *Sigler*, 532 F.3d at 478; *In re Baycol Prods. Litig.*, 532 F. Supp. 2d at 1047.  NPC does not challenge Dr. Mennitt's or Dr. Obeid's qualifications to treat ONJ, but plaintiff cannot establish that they are qualified to determine the cause of Ms. Newman's jaw problems.  *Tamraz*, 620 F.3d at 673 ("The ability to diagnose medical conditions is not remotely the same . . . as the ability to deduce . . . in a scientifically reliable manner, the causes of those medical conditions.") (citation omitted); *Wynacht v. Beckman Instruments, Inc.*, 113 F. Supp. 2d 1205, 1209 (E.D. Tenn. 2000) ("[T]here is a fundamental distinction between [a treating physician's] ability to render a medical diagnosis based on clinical experience and her ability to render an opinion on causation of [the plaintiff's] injuries" because the latter requires "the ability to deduce, delineate, and describe, in a scientifically reliable manner, the causes of those medical conditions.").

## IV.   DR. MENNITT'S CAUSATION OPINION, TO THE EXTENT THAT HE HAS ONE, WAS NOT FORMED WHILE HE TREATED MS. NEWMAN AND MUST BE EXCLUDED.

Dr. Mennitt testified that he did not diagnose Ms. Newman's jaw problems as being related to Aredia® or Zometa® while he treated her.  Mennitt Dep. at 59-60.  Dr. Mennitt further testified that he had never even heard of the association between bisphosphonates and ONJ until he spoke with Dr. Obeid in October 2003.  *Id.*  At that point, Dr. Mennitt had stopped treating

Ms. Newman. *Id.* at 24-25. Because no report was served from Dr. Mennitt, he may not offer any expert opinions that he did not reach during his treatment of Ms. Newman. *See, e.g., Fielden v. CSX Transp. Inc.*, 482 F.3d 866, 870-71 (6th Cir. 2007); *Lorenzi v. Pfizer Inc.*, 519 F. Supp. 2d 742, 750 n.6 (N.D. Ohio 2007) ("The treating physician for whom no expert report is supplied is not permitted to go beyond the information acquired or the opinion reached as a result of the treating relationship to opine as to the causation of any injury . . ."). As previously explained, *supra* Part II, Dr. Mennitt is not permitted to rely on what he learned from Dr. Obeid and offer an *ex post facto* opinion based upon that information. *See, e.g., Dura Auto. Systems*, 285 F.3d at 613; *Cooley v. Lincoln Elec. Co.*, 693 F. Supp. 2d at 781. Dr. Mennitt should not be permitted to give causation testimony because "[b]y his own admission, he has no expert opinion as to the cause of [Ms. Newman's] ONJ and may not offer expert testimony in this action." *Simmons* Order at 5 (excluding the causation testimony of an oral surgeon who testified that he did not have an opinion to a reasonable degree of medical certainty at the time he treated plaintiff).

## V. DR. OBEID ADMITTED THAT HE COULD NOT OFFER AN OPINION TO A REASONABLE DEGREE OF MEDICAL CERTAINTY THAT BISPHOSPHONATES CAUSED MS. NEWMAN'S JAW PROBLEMS.

Dr. Obeid testified that he does not hold an opinion, to a reasonable degree of medical certainty, that bisphosphonates caused Ms. Newman's ONJ. Obeid Dep. at 92, 142-43. In fact, Dr. Obeid acknowledged that the case reports that formed the basis of his "suspicion" were insufficient evidence to establish scientific causation to a reasonable degree of medical certainty. *Id.* at 53, 113, 122-23, 131. At best, Dr. Obeid's belief that Aredia® and Zometa® had a "strong association" with Ms. Newman's ONJ is speculative and cannot rise to the level of a substantiated causation opinion under *Daubert* and its progeny. *See Tamraz*, 620 F.3d at 674 (holding that a treating physician's testimony regarding the cause of plaintiff's injury should

have been excluded because, even if he could properly diagnose the plaintiff's disease, he could only speculate as to its cause); *Simmons* Order at 5 n.7 ("Dr. Obeid's finding a 'very close association' between ONJ and bisphosphonates . . . is not an opinion that Aredia and/or Zometa caused Mr. Simmons' ONJ."). Absent a *Daubert*-worthy differential diagnosis focused on causation, such speculative testimony by a treating physician is inadmissible. *Tamraz*, 620 F.3d at 673 ("[t]he ability to diagnose medical conditions is not remotely the same . . . as the ability to deduce . . . in a scientifically reliable manner, the causes of those medical conditions.") (citation omitted). Accordingly, his differential diagnosis, to the extent he performed one, was not proper, and his methodology was unreliable.

The Sixth Circuit has recognized that a differential diagnosis is a proper method for making a determination of specific medical causation. *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 178 (6th Cir. 2009). When performing a differential diagnosis, the physician is required to consider all relevant potential causes of the symptoms and then eliminate alternative causes based on a physician examination, clinical tests, and a thorough case history. *Id.* However, the reliability of an expert's techniques cannot be established merely by a claim that the expert performed a differential diagnosis. *Tamraz*, 620 F.3d at 674 ("[s]imply claiming that the expert used the 'differential diagnosis' method is not some incantation that opens the *Daubert* gate") (citation omitted). Instead, in order for a differential diagnosis to be deemed reliable (and admissible under *Daubert*), the doctor must (1) objectively ascertain, to the extent possible, the nature of the patients' injury, (2) "rule in" one or more causes of the injury using a valid methodology, and (3) engage in "standard diagnostic techniques by which doctors normally rule out alternative causes" to reach a conclusion. *Best*, 563 F.3d at 179 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 760 (3d Cir. 1994)); *see also Tamraz*, 620 F.3d at 674 (citing *Best*,

563 F.3d at 179); *Perry v. Novartis Pharms. Corp.*, 564 F. Supp. 2d 452, 469 (E.D. Pa. 2008)

("In order to result in an admissible conclusion, a differential diagnosis should reliably rule out

reasonable alternative causes of [the alleged harm] or idiopathic causes.") (quotation marks

omitted).  If the doctor uses very few standard diagnostic techniques to "rule out" alternative

causes, a good explanation must be offered as to why an alternative cause suggested by the

defense was not the sole cause.  *Paoli*, 35 F.3d at 760.  The failure to rule out alternative causes

is fatal to the reliability prong because "it means that these alternative causes may have been the

sole causes of plaintiffs' injuries."  *Id.* at 761 n. 31; *see also Perry*, 564 F. Supp. at 469; *Kolesar*

*v. United Agri Prods., Inc*., 246 F. App'x 977 (6th Cir. 2007) (excluding proffered expert where

she did not consider alternative causes); *Conde v. Velsicol Chem. Corp*., 24 F.3d 809, 814 (6th

Cir. 1994) (excluding causation opinions because experts were unable to rule out other potential

causes for the plaintiffs' symptoms).

    Dr. Obeid admitted that he could not rule out other potential causes of Ms. Newman's

jaw problems such as actinomycosis or infection from her sinus problems.  *See* Obeid Dep. at

108, 110.  Dr. Obeid also admitted that he could not say whether Ms. Newman had infection

with actinomyces before she had her 2001 extraction.  *Id*. at 60-61.

    Given his testimony that bisphosphonate users can develop osteomyelitis without

bisphosphonates being the cause, *id.* at 121, and his acknowledgement that Ms. Newman's

pathology reports consistently indicated that she had osteomyelitis, *id.* at 54-59, 61-63, 75-76,

82-83, Dr. Obeid did not and could not rule out under any reliable methodology that

osteomyelitis was the sole cause of Ms. Newman's necrotic bone, rather than her exposure to

Aredia[®] or Zometa[®].  *See*, *e.g*., *Tamraz*, 620 F.3d at 675 (holding that a treating physician's

differential diagnosis was inadequate where he failed to rule out other important risk factors,

including "unknown (idiopathic) causation."); *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 252 (6th Cir. 2001) (affirming exclusion of expert testimony that failed to account for "confounding factors" that could have caused similar symptoms).

Ultimately, however, any opinion by Dr. Obeid that Aredia® or Zometa® caused or contributed to Ms. Newman's ONJ is inadmissible under *Daubert* and Rule 702 because, as he admitted at his deposition, general causation between bisphosphonate use and ONJ has not been established. Obeid Dep. at 113, 122-23, 142-43. Scientifically reliable evidence must be based on the current state of the knowledge, not on predictions about what may be proved in the future. *See In re Human Tissue Prods. Liab. Litig.*, 582 F. Supp. 2d 644, 690 (D.N.J. 2008) ("Multidistrict litigation courts are often confronted with evaluating limited or evolving scientific and medical theories and evidence. The absence of definitive scientific or medical knowledge is unfortunately a reality in some cases. Nevertheless, district courts are charged with the role of gatekeeper and can only allow presently reliable evidence."). Courts have recognized that this may result in plausible hypotheses being excluded as evidence at trial. *See Daubert*, 509 U.S. at 597 ("We recognize that, in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations."); *Tamraz*, 620 F.3d at 677 ("[W]hat science treats as a useful but untested hypothesis the law should generally treat as inadmissible speculation."); *Henricksen v. ConocoPhillips Co.*, No. CV-07-224-JLQ, 2009 WL 361201, at *33 (E.D. Wash. Feb. 11, 2009) (Ex. 21) ("Evidence that is an insightful hypothesis is not admissible in court if it lacks scientific rigor. Although Plaintiffs' theory may one day be validated through scientific research and experiment, the law today cannot apply that conjecture."). "[T]he courtroom is not the place for scientific guesswork . . . [l]aw lags science; it does not lead it." *Rosen v. Ciba-Geigy Corp.*, 78

19

F.3d 316, 319 (7th Cir. 1996); *see also Perry,* 564 F. Supp. 2d at 468 ("In cases where no

adequate study shows the link between a substance and a disease, expert testimony will generally

be inadmissible, even if there are hints in the data that some link might exist.").  As the Court

previously found in *Simmons*, Dr. Obeid's "suspicion" of an association between ONJ and

bisphosphonates is not an opinion that Aredia® and/or Zometa® caused Ms. Newman's jaw

problems.  *Simmons* Order at 5 n.7.

## VI.  DR. KRAUT'S GENERAL CAUSATION OPINION MUST BE EXCLUDED BECAUSE IT IS NOT BASED ON RELIABLE DATA OR A SCIENTIFICALLY VALID METHODOLOGY, AND HE IS NOT QUALIFIED TO OFFER ANY OPINIONS IN THIS CASE.

NPC incorporates by reference the legal authorities and arguments on the general

causation and qualifications issues thoroughly addressed in NPC's Memorandum in Support of

*Daubert* Motion to Exclude Testimony of Plaintiff's Expert Dr. Richard Kraut filed in *Hill v.

Novartis Pharmaceuticals Corp.*, 3:08-cv-00934 (M.D. Tenn. Oct. 16, 2010), ECF No. 44.[12]

## VII.  DR. KRAUT'S SPECIFIC CAUSATION OPINIONS MUST BE EXCLUDED AS UNRELIABLE BECAUSE HIS OPINIONS ARE BASED ON AN IMPROPER METHODOLOGY.

An expert witness' opinion must be based on a chain of sound scientific reasoning and

not just his own belief in its accuracy.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

---

[12] Plaintiff cannot rely on recent admissibility rulings on Dr. Kraut that a New Jersey state court issued in litigation involving Aredia®/Zometa® patients who allegedly developed ONJ.  *Bessemer v. Novartis Pharms. Corp.*, No. MID-L-1835-08-MT (N.J. Super. Ct. Law Div. Apr. 30, 2010) ("Memorandum of Decision on Defendant's Motion to Exclude the Specific Causation Testimony of Dr. Richard Kraut") (Ex. 22).  There, the New Jersey court did not apply the exacting *Daubert* standard but, rather, applied the more lenient New Jersey admissibility standard.  As the court explained (when ruling on NPC's admissibility challenges to Dr. Marx's opinions), New Jersey courts "*have not adopted the Daubert standard for admission of expert testimony*." *Bessemer v. Novartis Pharms. Corp.*, No. MID-L-1835-08-MT, at 2 (N.J. Super. Ct. Law Div. Apr. 30, 2010) (emphasis added) (Ex. 23); *see id.* ("[T]he courts in this State acknowledged the *Daubert* standard as 'overly restrictive.'"); *id.* at 3 (discussing "the stricter *Daubert* standard"); *see also Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 360 (2d Cir. 2004) (distinguishing New Jersey court's ruling regarding expert witness because it "does not involve the demanding inquiry into expert testimony that *Daubert* and Rule 702 require for the federal courts").  Thus, the New Jersey court's decision to admit Dr. Kraut's opinions is not persuasive authority and does not apply the specific *Daubert* challenges at issue before this Court.

("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Dr. Kraut's opinion fails that test. Even though he has treated many patients with osteomyelitis who developed ONJ and *never* received a bisphosphonate, Deposition of Dr. Richard Kraut at 107 (Nov. 18, 2009) (Ex. 24) (hereinafter, "November 18 Kraut Dep."); when he is confronted with a case of osteomyelitis in a patient who *has* taken a bisphosphonate, he always diagnoses them with bisphosphonate-induced ONJ. April 27 Kraut Dep. at 139; April 6 Kraut Dep. at 164. Merely assuming a causal relationship because of a temporal relationship is patently unreliable under *Daubert*. In *Tamraz*, the Sixth Circuit noted that expert causation opinions based on similar grounds were inadmissible:

> Essentially, this is a bit like saying that if a person has a scratchy throat, runny nose, and a nasty cough, that person has a cold; if, on the other hand, that person has a scratchy throat, runny nose, nasty cough, and wears a watch, they have a watch-induced cold.

*Tamraz*, 620 F.3d at 673 (quoting *Kelley v. American Heyer-Schulte Corp.*, 957 F. Supp. 873, 882 (W.D. Tex. 1997), with approval (citations omitted)). Such reasoning is extremely suspect, which has prompted other courts to reject it as unscientific in the absence of convincing epidemiology evidence.

In addition to being unscientific *ipse dixit*, Dr. Kraut's methodology *cannot* be considered scientifically reliable if the differential diagnosis methodology he employed does not rule *out* other potential risk factors as a cause or the substantial contributing factor of Ms. Newman's necrotic bone. A proper differential diagnosis requires the expert to genuinely eliminate alternative causes based on a physical examination, clinical tests, and a thorough case history. *Best*, 563 F.3d at 178; *see also Tamraz*, 620 F.3d at 674. When the outcome of that process is a

foregone conclusion, as it is with Dr. Kraut, regardless of medical or scientific evidence to the contrary, the resulting opinion must be excluded under *Daubert*.  As the Sixth Circuit held:

> Calling something a "differential diagnosis" or "differential etiology" does not by itself answer the reliability question but prompts three more: (1) Did the expert make an accurate diagnosis of the nature of the disease? (2) Did the expert reliably rule in the possible causes of it? (3) Did the expert reliably rule out the rejected causes?  If the court answers "no" to any of these questions, the court *must exclude* the ultimate conclusion reached.

*Tamraz*, 620 F.3d at 674 (emphasis added) (citing *Best*, 563 F.3d at 179); *see also Perry*, 564 F. Supp. 2d at 469.  Dr. Kraut's failure to rule out alternative causes is fatal to the reliability prong because "it means that these alternative causes may have been the sole causes of plaintiffs' injuries."  *In re Paoli*, 35 F.3d at 760 n.31; *see also Perry*, 564 F. Supp. 2d at 469.

Here, Dr. Kraut failed to employ a reliable scientific methodology in ruling out any of Ms. Newman's numerous possible risk factors for ONJ.  For example, although Dr. Kraut acknowledged that Ms. Newman was repeatedly diagnosed with actinomyces osteomyelitis, May 4 *Newman* Kraut Dep. at 47, 48, 50, and her pathology reports repeatedly diagnosed actinomyces osteomyelitis, Dr. Kraut cannot identify any scientific criteria for ruling out actinomyces as the cause of Ms. Newman's exposed jaw bone, *id.* at 64-65 ("chicken or the egg"), other than his repeated belief that it was not actinomyces osteomyelitis because of Ms. Newman's use of bisphosphonates.  That Dr. Kraut explained how he *might* differentiate between an osteonecrosis that was caused by actinomyces and an osteonecrosis that was caused by bisphosphonates is not helpful to the jury because he fails to explain how he concluded that *Ms. Newman's* osteonecrosis was caused by bisphosphonates and not actinomyces.  *See Tamraz*, 620 F.3d at 671 (finding testimony unreliable because physician testified that there were diagnostic tests generally available, but that he had not conducted those tests regarding plaintiff's condition).

Dr. Kraut's testimony also shows that he failed to consider, let alone rule out, numerous other possible causes of Ms. Newman's jaw problems other than Aredia® or Zometa®.  As discussed above, Dr. Kraut testified that patients like Ms. Newman with periodontal disease were more likely to develop osteomyelitis, Sept. 24 *Nightlinger* Kraut Dep. at 73; April 6 Kraut Dep. at 63, and agreed with Dr. Marx that periodontal disease is the number one co-morbidity for ONJ, Sept. 24 *Davids* Kraut Dep. at 65-66.  Yet, he left Ms. Newman's periodontal disease off of his differential diagnosis.  May 4 *Newman* Kraut Dep. at 74.  Dr. Kraut's admitted inability to rule out periodontal disease makes his "differential diagnosis" all the more speculative and unreliable.  As the Sixth Circuit explained:

> This attribution [of Tamraz's Parkinson Disease to manganese] is harder still if, as Dr. Carlini hypothesized, Tamraz already had a . . . predisposition toward it, and even more so if, as Dr. Carlini also acknowledged, the base probability of getting parkinsonism from such a predisposition is unknown. . . . Dr. Carlini never explained how he made this leap-how *this* case stemmed from manganese exposure

*Tamraz*, 620 F.3d at 671.  When asked how he ruled out other "contributing factors" such as chemotherapy and corticosteroid use, Dr. Kraut merely and repeatedly cited to Ms. Newman's bisphosphonate use.  *See*, *e.g.*, May 4 *Newman* Kraut Dep. at 69-70.  Opinions based on "bald assurances of validity" are not admissible or of assistance to the jury.  *Smelser v. Norfolk S. Ry.*, 105 F.3d 299, 303 (6th Cir. 1997), *abrogated on other grounds as recognized by Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 515 n.4 (6th Cir. 1998).  An "expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Rosen*, 78 F.3d at 319 (internal quotation marks and citation omitted); *Joiner*, 522 U.S. at 146.

Because Dr. Kraut is unable to rule out these alternative causes of Ms. Newman's ONJ, his differential diagnosis is scientifically invalid and, thus, unreliable under *Daubert*.  *See*

23

*Tamraz*, 620 F.3d at 671; *Best*, 563 F.3d at 179; *see also Haller v. AstraZeneca Pharms. LP*, 598

F. Supp. 2d 1271, 1306 (M.D. Fla. 2009) (granting summary judgment against plaintiff alleging

that Seroquel caused diabetes given plaintiff's expert could not properly rule out other risk

factors as part of his differential diagnosis); *Kolesar*, 246 F. App'x at 980-987; *Conde*, 24 F.3d at

814.  A reliable opinion "requires not just an educated hunch but at least a preponderance of the

evidence[,]" which Dr. Kraut has consistently failed to demonstrate.  *See Tamraz*, 620 F.3d at

673.  Accordingly, his opinions should be excluded under *Daubert* and Fed. R. Evid. 702.

## CONCLUSION

For the foregoing reasons, the Court should grant this motion and exclude any causation

opinions of plaintiff's experts.

May 19, 2011                                  Respectfully submitted,


                                             s/ Katharine R. Latimer
                                             Joe G. Hollingsworth
                                             Katharine R. Latimer
                                             (klatimer@hollingsworthllp.com)
                                               HOLLINGSWORTH LLP
                                               1350 I Street, N.W.
                                               Washington, DC  20005
                                               (202) 898-5800
                                               (202) 682-1639 (fax)

                                             *Attorneys for Defendant*
                                             *Novartis Pharmaceuticals Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this 19th day of May 2011 served a true and correct copy of the foregoing Novartis Pharmaceuticals Corporation's Memorandum of Law in Support of *Daubert* Motion to Exclude Causation Testimony of Plaintiff's Experts in the *Newman* Case by operation of the Court's Electronic Case Filing System on the following, including Plaintiffs' Liaison Counsel:

Robert G. Germany, Esq.
Pittman, Germany, Roberts & Welsh, LLP
P.O. Box 22985
Jackson, MS  39225-2985
(601) 948-6200

C. Patrick Flynn
Flynn & Radford
320 Seven Springs Way
Suite 150
Brentwood, TN 37027
(615) 370-9448

s/ Katharine R. Latimer
Katharine R. Latimer
(klatimer@hollingsworthllp.com)
  HOLLINGSWORTH LLP
  1350 I Street, N.W.
  Washington, DC 20005
  (202) 898-5800
  (202) 682-1639 (fax)

*Attorneys for Defendant*
*Novartis Pharmaceuticals Corporation*